## SMITH v. INDIANAPOLIS STREET RAILWAY COMPANY.

[No. 19,068.    Filed April 30, 1902.]

CONSTITUTIONAL LAW.—*Doubt in Favor of Statute.*—Every ultimate reasonable doubt as to the validity of a statute is to be resolved in its favor.  *p. 427.*

SAME.—*Wisdom of Statute Not for Court.*—If a statute is within the legislative power, the court cannot set up its judgment as to whether the power has been wisely or unwisely exercised.  *p. 427.*

SAME.—*Statute.*—*Two Interpretations Admissible.*—If an act admits of two interpretations, one of which will bring it within, and the other presses it beyond, the constitutional authority of the General Assembly, that interpretation will be adopted which will make it possible to uphold the act.  *p. 427.*

STREET RAILROADS. — *Franchises.* — *Special Privileges.* — *Constitutional Law.*—The act of March 5, 1899, authorizes cities of more than 100,000 population, according to the last federal census preceding the incorporation of "any street railroad company now or hereafter organized," to enter into a contract with any such company, to the exclusion of all others, extending its franchise for a term not exceeding thirty-four years, and fixing fares for passengers at a rate higher than that fixed by a previous statute.  The act also contains a provision that upon the failure to contract with any such company, such city through its board of public works shall "open to free competition the further occupancy for a period not exceeding thirty years," and on such conditions as it may deem best.  *Held,* that the act is not unconstitutional as being a grant of special privileges.  *pp. 428–432.*

SAME. — *Incorporation.* — *Presumption.* — In an action against a street railroad corporation, it will be presumed that the defendant company was organized under the general act for the incorporation of street railroads.  (§4143 *et seq.* R. S. 1881.)  *p. 434.*

SAME.—*Corporations.*—*Creation by Special Act.*—*Extending Rights of Existing Street Railway Company.*—The act of March 5, 1899, empowering cities of a certain class to contract with a street railway company extending its franchise and otherwise enlarging its rights is not unconstitutional, as being in violation of §13, article 11, of the State Constitution, requiring corporations other than banking corporations to be formed under general laws; since the act does not relate to the creation of corporations, but provides for the granting of more rights to street railways already organized.  *pp. 434–437.*

CONSTITUTIONAL LAW.—*Street Railroads.*—*Act of 1899.*—*Local and Special Legislation.*—The act of March 5, 1899 (Acts 1899, p. 260) regulating the granting of street railroad franchises in cities of 100,000 inhabitants is not unconstitutional as being local and special legislation in violation of §22, article 4, of the State Constitution. *p. 437.*

SAME.—*Local and Special Law.*—The fact that the General Assembly enacts a local and special law not comprehended within §22 of the State Constitution is *per se.*a legislative declaration that a general law cannot be made applicable. *p. 438.*

From Marion Superior Court; *J. M. Leathers*, Judge.

Action by Charles F. Smith against the Indianapolis Street Railway Company.. From a judgment for defendant, plaintiff appeals. *Affirmed.*

*F. B. Burke, H. Warrum* and *A. Schoonover*, for appellant.

*F. Winter, C. Winter* and *S. O. Pickens*, for appellee.

GILLETT, J.—The appellant filed a complaint in the court below charging, in substance, that on the 5th day of May, 1899, the appellee was a street railroad corporation organized under the laws of this State, and was then engaged in operating an electric street railroad upon the streets of the city of Indianapolis; that on said day appellant entered one of appellee's street cars so operated, for the purpose of being conveyed therein as a passenger; that appellee tendered three cents, as his fare, to the conductor of said car, but that the latter refused to receive the same, and demanded that appellant should pay a fare of five cents, or surrender a ticket that the company sold at the rate of six tickets for twenty-five cents, or twenty-five tickets for $1; that appellant refused so to do, and was ejected by the conductor from said car, to appellant's damage, etc. Appellee demurred to this complaint. Its demurrer was sustained. Appellant excepted to the ruling, and assigns error thereon in this court.

Appellant's counsel state in their brief: "The real question—the entire question before the court—may be said to be the constitutionality of the act of 1899, under which

appellee claims the right to charge more than three cents for a fare.    If this act is constitutional, we do not and cannot claim any right of recovery against appellee."

As the complaint in this case does not allege that the appellee was not acting under a contract made with said city pursuant to Acts 1899, p. 260, §5458c *et seq.* Burns 1901, it must be presumed that the requirement of appellee's conductor was lawful, unless said act is unconstitutional, as claimed by appellant's counsel.    The section of the State Constitution that they especially claim the act violates is §23 of article 1.    That section is as follows:    "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

Before further discussing the law applicable to this particuar case, we announce certain propositions upon which the authorities do not divide:    (1) Every ultimate reasonable doubt as to the validity of a statute is to be solved in its favor.    "It is not on slight implication and vague conjecture, that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."    Marshall, C. J. in *Fletcher* v. *Peck,* 6 Cranch 87, 128, 3 L. Ed. 162.    (2) If a statute is within the legislative power, the court cannot set up its judgment as to whether the power has been wisely or unwisely exercised.    It is its duty in such cases, not to obstruct, but to enforce the legislative will.    (3) If an act admits of two interpretations, one of which will bring it within, and the other presses it beyond the constitutional authority of the General Assembly, that interpretation will be adopted which will make it possible to uphold the act, because a presumption will not be indulged that the lawmaking power intended to violate the fundamental law, unless that conclusion is forced upon the court by unam-

biguous language. As said by Harris, J., speaking for the court in *People* v. *Supervisors,* 17 N. Y. 235, 241: "Before proceeding to annul, by judicial sentence, what has been enacted by the lawmaking power, it should clearly appear that the act cannot be supported by any reasonable intendment or allowable presumption."

Counsel for appellant say: "We do not deny the power of the legislature to authorize a grant that must of necessity be monopolistic in its nature, otherwise railway franchises could not be granted at all." It is, of course, competent for the General Assembly to make provision by law whereby, in the grant of a street railroad franchise, there may pass with the grant the exclusive right of the grantee to operate cars over the particular space occupied by its tracks during the existence of its franchise; otherwise the grant might be of little or no value. But the conclusion of counsel for appellant that the law in question is of a monopolistic character is based on the assumption that it was so framed that only the appellee company could obtain the franchise that the act purported to authorize the city to grant.

Appellant's counsel state that the appellee was incorporated subsequent to the year 1890, and that, at the time of the enactment of the act of 1899, appellee was operating under a franchise that it had been held by the Supreme Court of the United States would expire on January 18, 1901. Of course we are not judicially advised of this; but as the act in question, in its earlier sections, seems to assume the existence of a street car franchise, held under said city, that was soon to expire, we are content, for the purposes of this opinion, to assume the existence of the facts so stated.

The act is a very long one, and it would greatly prolong this opinion to state all of its provisions in detail. In substance, the act provides that it "may be lawful" for any city having a population in excess of 100,000 persons by

the last federal census preceding the incorporation of "any street railroad company now or hereafter organized", to enter into a contract with said company for the granting to said company of a franchise for a term not exceeding thirty-four years, subject to many conditions, relative to compensation, fares, paving, the use of its lines by suburban and interurban railroad companies, the right of control of the city, etc.   One condition that should be mentioned is as follows:   "As a part of any contract entered into pursuant to the provisions of this act, and as a part of the consideration therefor, the company entering into said contract shall first make an absolute surrender to such city of all franchises and rights to the use and occupancy of the streets, alleys, and public places of such city owned, held, or claimed by such company within the corporate limits of such city at the time of the making of such contract pursuant to the provisions of this act, or theretofore owned, held or claimed by such company."   Section 8 of the act provides that where the use or occupancy of any streets shall be had by any street railroad company under any ordinance or contract fixing or limiting, or attempting to fix or limit, the time of such occupancy, then, if no extension has been granted between the date of the enactment of the statute and a date nine months before the date of the termination of said right, and if no other company has acquired the franchise and property by contract with said company and the city, the right of said company to occupy the streets shall, at the expiration of the time so fixed or attempted to be fixed, absolutely expire, and the company is then authorized to remove its tracks, etc.   It is further provided by said section that, not later than nine months before said time expires, such city, through its board of public works, shall "open to free competition the further occupancy for a period not exceeding thirty years of the streets of such city," subject to the conditions and limitations of section two of the act, and that, "in such competition no company now or

hereafter organized for such purpose shall be excluded." If the occupying company is not the successful bidder, and elects not to remove its tracks, etc., then provision is made that the company that is successful in the competition may institute proceedings to condemn such property. Section 9 is especially important, and therefore we quote it in full: "Nothing contained in this act shall be so construed as to take away from the board of public works and common council of any such city the exclusive powers now exercised over the streets, highways, alleys and bridges within such city, or the rights and powers now possessed by such board of public works and common council to enter into contract with reference to the use of the streets, alleys and public places in such city for street railroad purposes, except in so far as such powers and rights shall be affected by contracts entered into pursuant to the provisions of this act, and except as such powers are reserved to such city by the provisions of this act." Section 10 of the act is as follows: "It shall be unlawful for any railroad company operating under a contract secured under the provisions of this act or an employe of the same, to charge or receive any greater amount for fares than that provided for in this act, and it shall be unlawful to fail or refuse to keep on sale tickets as provided in this act, and any one violating any of the provisions of this section shall be fined in any sum not to exceed $100." Section 59 of the Indianapolis Charter, §3830 Burns 1901, provides, among other things, that the board of public works of said city is granted the right (subject to the approval of the common council) "to authorize and empower by contract, telegraph, telephone, electric light, gas, water, steam or street car or railroad companies to use any street, alley or public place in such city, and to erect necessary structures therein, and to prescribe the terms and conditions of such use, to fix by contract the prices to be charged to patrons".

Section 9, that we have quoted above, when subjected to proper interpretation and construction, is broad enough to authorize the statement that it gave to the city an absolutely free hand in the granting of a street railroad franchise, to take effect *in praesenti,* except as in the act provided, with reference to reservations in the contract. We base this conclusion primarily on the language of said section. It puts upon the power of the city to grant street railroad franchises the limitations as to the form of contract provided for in the other portions of the act, thus fusing it with the rest of the act, and recognizing in the very prescribing of such limitations the fact that it was intended to grant to the city all power not so expressly withheld. Section 10, making it unlawful to exact any fare in excess of the provisions of the act, also indicates that it was not intended to limit the city, under §9, to an authority that was circumscribed except by the act of which said section is a part. We think that §9 is to be construed in connection with §§1 and 2 of the act. Any number of corporations might have been organized under the general law for the incorporation of street railroad companies after the act of 1899 was passed, and while the federal census of 1890 was the last census, and thereby been in a position, under §§1 and 2 of the statute, to bid for a franchise that would have enabled the company obtaining it to occupy other streets, or to parallel the lines of the occupying company, where the width of the street permitted. Indeed it would be competent at any time hereafter for the city to grant franchises under §9 of the act, to companies hereafter organized, provided that the rates of fare fixed did not exceed the maximum rates fixed by §2, and provided that the contract was in the other respects in accord with such other provisions of the act as are applicable. It was not necessary that a company competing for the franchise with the occupying company should have been in possession of an unexpired franchise, but, if it had such a franchise, it was required to

surrender it, as a part of the consideration of the new con-
tract. The occupying company had no advantage whatever
over a company organized to compete with it, except that it
had possession for a limited time of the space in the streets
that its tracks occupied, and if that circumstance gave it
such advantage over other corporations that might bid for
the franchise that it was enabled to make a bid that the city
saw fit to accept as against other bids, that was an advan-
tage that would naturally belong to it.

Does such a statute amount to a grant by the General As-
sembly of a privilege or immunity in violation of §23 of
article 1 of the State Constitution? Waiving any matter of
technical construction with reference to this provision, we
hold that it does not. The city was merely empowered, in
its discretion, to extend appellee's franchise, or it might, at
a particular period before the expiration of the time that
such franchise would expire, let a contract of franchise upon
public competition, or it might during any of said time have
exercised the authority that the General Assembly expressly
reserved to it to grant a franchise, if it could take effect *in
praesenti,* for the use of its streets by virtue of §9. There is
nothing in the claim that no other company but appellee
could make a contract by which it could charge in excess of
three cents as fare. The act was intended as a readjustment
of the whole street car situation in Indianapolis, at least as
applied to any company entering into a contract with the
city by virtue of said act. A careful study of the act has
convinced us that its sole effect, in so far as it relates to the
relations of the city to street railroad companies, was to
make it possible, under specified limitations, to make a
contract for a street railroad franchise that was not ham-
pered by the provisions of the so called three cent fare law
of 1897. In this view it is quite plain that the act was not
a grant to the appellee, but was merely a restoration to the
city of its former power to enter into contracts for the grant
of street railroad franchises.

Because a law merely authorizes a municipality to make a particular contract, leaving it authority, under other sections of the law, to make other contracts, does not create a monopoly, even if there is a contract let without advertising or competition.

If it was the desire of said city, as such desire found expression through its authorized representatives, to extinguish the remaining portion of appellee's rights under its former franchise, by entering into a new contract with it that would supersede the one that before existed, there would be no occasion to advertise and offer competition for that purpose, because no one but appellee could offer that which the city desired to acquire. It would doubtless have been a wiser law, and more in keeping with the modern view that effort should be made to obtain the best price for the right to use the public streets, if the act had provided that before contracting the city should be required to invite competition; but even without that limitation the city had full authority so to do, and if it is now perceived that it made an unwise contract with appellee,—a matter concerning which we are, of course, not judicially advised,—the blame properly rests upon the representatives of the city who made the contract.

Even if we were to grant that §§1, 2, and 9 of the act have been construed by us too broadly, still appellant must fail in this particular ground of attack, for beyond question the city was authorized to refuse to negotiate with appellee alone, and could wait until the time fixed in §8, nine months before the expiration of appellee's franchise, and then let a contract upon public competition. As a mere business proposition, the city, if it could not obtain satisfactory terms from appellee at the outset, could have much better afforded to bide its time than appellee, for ultimately the latter would have been compelled to sue for terms.

The act represents the legislative judgment that appellee's then existing franchise should be merged in a new

franchise, if it could be acquired on sufficiently advantageous terms. The General Assembly therefore merely gave the city permission to treat with appellee, for something that no one but appellee possessed, on any terms upon which the contracting parties might agree, provided that they were not more burdensome than those fixed as a maximum of terms by the act. As we have stated, the act is not a grant to a private corporation, but it is a mere delegation of business powers to a governmental corporation. If the act, *ex proprio vigore,* had granted the appellee a franchise, or if it had directed the city so to do, a different question would have been presented; but the attack of appellant, in so far as it is based on the claim that the act is a grant of a privilege or immunity, must fail, since it must be admitted that the act is only permissive. The powers conferred might be abused by the agent, but in honest and capable hands there was no reason, so far as the provisions of the act were concerned, why there should have been such abuse, if any there was.

It is next claimed that the act in question violates the following section of the State Constitution: "Corporations, other than banking, shall not be created by special act, but may be formed under general laws." Section 13, article 11. If the appellee is a corporation organized under the laws of Indiana, as the complaint alleges, it must be presumed that it was organized under the general act for the incorporation of street railroads that became a law September 7, 1861. §4143 *et seq.* R. S. 1881. Section 2 of that act provides that the organization "shall be a body politic and corporate in perpetuity." Under that act, appellee's corporate continuity is only dependent upon §11 of the act mentioned, that provides that the "act may be amended or repealed at the discretion of the legislature." A street railroad corporation is none the less a corporation because it does not possess a franchise. It is its right to be a corporation that gives it the capacity to acquire a franchise. In this case the

General Assembly did not grant appellee anything. Whatever was granted was power to the city. Under the act of 1899, it was within the authority of the .city to have granted this corporation, or any other street railroad corporation, a new franchise. The grant applied to the city not only in its relation to appellee, but in its relations to all such corporations as might contract with it. The act amounted to no more than a regulating of the right, and a granting of a more ample and definite power. Our cases of *City of Indianapolis* v. *Navin,* 151 Ind. 139, 41 L. R. A. 337, and *In re Bank of Commerce,* 153 Ind. 460, 47 L. R. A. 489, conclusively settle the question under consideration against appellant. In the Navin case it was said: "When the present Constitution of 1851 went into effect, on November 1, 1851, there were a great number of corporations in this State which had been created by special acts. The legislature, commencing with its first session of 1852, after the Constitution took effect, again and again, by special acts, enlarged the powers and privileges of such corporations, but in no instance created a corporation by special act, thus recognizing the difference between the creation of a corporation and the regulation of a corporation already in existence. There sat as members of the legislature passing such acts many persons who had been members of the constitutional convention, and who were familiar with the provisions of the Constitution and its intended reforms and changes. No one questioned the right of the legislature to pass such special acts, and for over forty-five years the power assumed by the legislature has never been challenged, but has been acquiesced in by the State and people. This practical construction is influential. *French* v. *State, ex rel.,* 141 Ind. 618, 628, 29 L. R. A. 113; *Hovey* v. *State, ex rel.,* 119 Ind. 386; *City of Terre Haute* v. *Evansville, etc., R. Co.,* 149 Ind. 174, 37 L. R. A. 189, and cases cited. It is one thing to create a corporation, bring it into existence, and quite another, as an existing corporation, to regulate

its conduct and relations as to other corporations and persons. It has been decided in many cases that, when a corporation has been created, a special act regulating it, without changing the organization of the corporate body, is not within the prohibition. *Wilkins* v. *State,* 113 Ind. 514; *Central, etc., Assn.* v. *Alabama, etc., Ins. Co.,* 70 Ala. 120; *Attorney-General* v. *North American Life Ins. Co.,* 82 N. Y. 172; *In re New York, etc., R. Co.,* 70 N. Y. 327, 337, 338; *In re Application of Church,* 92 N. Y. 1, 4; *Syracuse City Bank* v. *Davis,* 16 Barb. (N. Y.) 188; *Southern Pacific R. Co.* v. *Orton,* 32 Fed. 457; *Green* v. *Knife Falls, etc., Corp.,* 35 Minn. 155, 27 N. W. 924; *St. Paul, etc., Ins. Co.* v. *Allis,* 24 Minn. 75; *Cotton* v. *Mississippi, etc., Co.,* 22 Minn. 372; *St. Joseph, etc., R. Co.* v. *Shambaugh,* 106 Mo. 557, 17 S. W. 581; *State* v. *Cape Girardeau, etc., R. Co.,* 48 Mo. 468; *Attorney-General* v. *Joy,* 55 Mich. 94, 106, 107, 20 N. W. 806; *Wallace* v. *Loomis,* 97 U. S. 146, 24 L. Ed. 895; Morawetz on Corp., §12; Clark on Corp., pp. 43-45."

In the Bank of Commerce case it was held that an act providing for the extension of the corporate life of a corporation, created by special act before the adoption of the present Constitution, amounted to an effort to create a corporation, and was therefore in violation of that instrument, but the Navin case and the Bank of Commerce case are written upon the same lines. If the act itself conferred a new franchise upon the company, a different question might be presented, as the Constitution cannot be evaded by the creation of a corporation by general act, and the subsequent grant to it of extraordinary powers by special act. We have not been unmindful that the act of 1897 relative to fares was an amendment of the charter of all street railroad companies operating in cities having a population of more than 100,000 persons. But, if it be objected that the act of 1899 impliedly gave the appellee a right to contract relative to fares that it did not possess after the act of 1897 became a

law, the answer to that is, that, if it was competent for the General Assembly to lay that burden on appellee after it was organized, under the reserved right of amendment, then it was also competent to repeal the act that created the burden. In other words, if the Navin case, upholding the law of 1897, correctly decided that that law did not amount to the creation of a corporation by special law, then, by the same token, it must be held that the law of 1899 taking away the disability is not obnoxious to that constitutional provision.

The act in question is not invalid, because it is not a general law. The power of the General Assembly to pass local and special laws finds its restraint in §22 of article 4 of the State Constitution. The General Assembly is by that section denied power to enact local or special laws upon seventeen subjects. The next section ordains that: "In all the cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State." As the subject-matter of the legislation in question does not fall within said §22, it must be held, as it has been held by this court since the decision of *Gentile* v. *State,* 29 Ind. 409, that the determination of the General Assembly that a law, not relating to any of the subjects mentioned in said §22, cannot be made general is not subject to review by the courts. *Clem* v. *State,* 33 Ind. 418; *State, ex rel.,* v. *Tucker,* 46 Ind. 355; *Vickery* v. *Chase,* 50 Ind. 461; *Mount* v. *State, ex rel.,* 90 Ind. 29, 46 Am. Rep. 192; *Kelly* v. *State, ex rel.,* 92 Ind. 236; *Warren* v. *City of Evansville,* 106 Ind. 104; *Johnson* v. *Board, etc.,* 107 Ind. 15; *Wiley* v. *Corporation of Bluffton,* 111 Ind. 152; *City of Evansville* v. *State,* 118 Ind. 426, 4 L. R. A. 93; *State, ex rel.,* v. *Kolsem,* 130 Ind. 434, 14 L. R. A. 566; *Bell* v. *Maish,* 137 Ind. 226; *Young* v. *Board, etc.,* 137 Ind. 323; *Pennsylvania Co.* v. *State,* 142 Ind. 428; *Mode* v. *Beasley,* 143 Ind. 306; *Woods* v. *McCay,* 144 Ind. 316, 33 L. R. A. 97; *City*

*of Indianapolis* v. *Navin, supra.* The fact that the General Assembly enacts a special or local law not comprehended within said §22 is *per se* a legislative declaration that a general law cannot be made applicable. *State, ex rel.,* v. *Kolsem, supra; Mode* v. *Beasley, supra; Woods* v. *McCay, supra; City of Indianapolis* v. *Navin, supra.*

Objection is made by appellant to some of the sections of the act that we have not mentioned, such as the grant of the right to purchase other street railroad lines in said city, etc. As it might be conceded that all of these sections were unconstitutional, yet, as enough would remain to authorize the making of a contract as to the rates of fare, we deem it unnecessary to decide any of such further questions. The court below did not err in sustaining the demurrer to appellant's complaint.

Judgment affirmed.